Christian H. Dribusch (507021)  Date: November 30, 2011
WHITEMAN, OSTERMAN, & HANNA LLP  Time: 10:30 a.m.
One Commerce Plaza, Suite 1900  Place: James T. Foley Courthouse
Albany, New York 12260  445 Broadway, 3rd Floor
(518) 487-7728  Albany, NY 12207

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

In re:

**NORTH RIVER HOLDINGS, LLC**

                    *Debtor*

**Chapter 11**

**Case No.  11-13487**

------------------------------------------------------------X


**MOTION (I) AUTHORIZING DEBTOR'S SALE OF ASSETS OUTSIDE THE
ORDINARY COURSE OF BUSINESS PURSUANT TO 11 U.S.C. §363; (II)
AUTHORIZING THE DEBTOR TO ASSUMPE AND ASSIGN CERTAIN UNEXPIRED
LEASES AND EXECUTORY CONTRACTS PURSUANT TO 11 U.S.C. §365; (III)
CONFIRMING BIDDING PROCEDURES; AND (IV) AUTHORIZING BREAK-UP FEE**

TO:     HON. ROBERT E. LITTLEFIELD, CHIEF UNITED STATES BANKRUPTCY JUDGE

        North River Holdings, LLC a New York limited liability company, debtor-in-possession

herein (the "Debtor"), by and through its undersigned counsel, hereby moves this Court for entry

of an order authorizing the Debtor to sell certain assets outside the ordinary course of business

and enter into a sale agreement and assign certain agreements (the "Motion").

        The proposed sale agreement is attached hereto as <u>Exhibit A.</u>

        In support of the Motion, the Debtor alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.      On November 4, 2011 (the "Petition Date"), the Debtor filed in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

2.      The Debtor has continued in possession of its property and has continued to operate and manage its business as debtor-in-possession pursuant to Bankruptcy Code § 1107(a) and § 1108.

3.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 157 and § 1334.

4.      Venue is proper in this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. § 1408 and § 1409.

5.      The predicate for the relief sought is Bankruptcy Code § 363, § 365, and § 105, and Federal Rules of Bankruptcy Procedure Rules 2002, 6004, and 9007.

## BACKGROUND

6.      Prior to the Petition Date, the Debtor owned real estate operated by Garnet Hill Lodge, Inc., a related entity, as a rustic country inn nestled into the Adirondack Mountains, overlooking pristine Thirteenth Lake in North River, New York.

7.      The Debtor together with Garnet Hill Lodge, Inc., a related company also having filed a bankruptcy petition on even date, have negotiated a proposed sale Agreement ("Asset Purchase Agreement") a copy of which is attached hereto as Exhibit A and incorporated herein by reference.

8.      Although the Debtor would have preferred to sell the Assets outside of the bankruptcy process it is unable to do so because of certain state court litigation involving the

Debtor, Garnet Hill Lodge, Inc., Mary Donnellan-Fahy, and Joseph Fahy. Mary Donnellan and

Joseph Fahy are ex-spouses. Upon information and belief, Joseph Fahy is unwilling to consent

to the sale by the Debtor which is to the detriment of its creditors because he wants to negotiate a

benefit personal to himself from his ex-spouse, Mary Donnellan-Fahy. Accordingly, the Debtor

has determined that it is in the best interest of creditors that its assets be sold through a

bankruptcy proceeding so that is creditors can be paid.

9.     The Debtor has a pre-petition lien with TD Bank f/k/a TD Banknorth, N.A.

secured by most of the personal property of the Debtor. The mortgage facility has

approximately $805,000.00 outstanding. North River Holdings, LLC is currently making

payments of approximately $8,400.00 per month on the credit facility. TD Bank has commenced

a foreclosure proceeding with the New York State Supreme Court with is venue in the County of

Warren as more particularly described under index number 55360/2011. A summary judgment

motion by TD Bank on the foreclosure action is pending. Neither the Debtor nor Garnet Hill

Lodge, Inc. has the ability to continue making payments to TD Bank.

10.     As a matter of disclosure, the Debtor's principal, Mary Donnellan-Fahy and her

ex-spouse Joseph Fahy, are each a guarantor of the debt to TD Bank.

11.     The Debtor has under $25,000 of alleged priority debt and alleged unsecured debt

as more particularly set forth in its Petition.

12.     The sale by the Debtor and North River Holdings, LLC should generate sufficient

funds to pay TD Bank as required under Bankruptcy Code § 363(f).

13.     It is essential that the sale of the Debtor's assets and business be consummated as

soon as possible. The Debtor is experiencing losses. Given the loss of sales, potential customer

defections and insufficient working capital, the Debtor has determined that the only way to preserve

the Debtor's business as a going concern is to sell its assets. If the business is not sold pursuant to the Agreement or such higher or better offer that is made at the hearing on the sale, the Debtor's continued viability will be severely impaired, the Debtor will have to shut down its operations, and approximately     jobs will be lost. As one of the mid-size employers in the area, a closing of the Debtor's facility would cause tremendous hardship to the Debtor's employees and their families as well as the community. Consummation of the Agreement or an alternative transaction will alleviate such hardship, preserve jobs, and maintain the viability of the Debtor's business as a going concern, albeit under new ownership.

14. Because of the Debtor's financial situation and substantial secured debt, the Debtor's management has determined that a stand-alone reorganization is not possible.

15. If the Debtor's operations are to be preserved as a going concern, the sale process must be concluded rapidly. The business has no proprietary products and totally depends on the continued good will, loyalty and flow of its customers.  While the Debtor has been able to persuade its customers to continue with the Debtor, it is a virtual certainty that the Debtor's customers will cease doing business with the Debtor if the sale or an alternative transaction is not approved. Any decision by the Debtor's customers to withdraw their business from the Debtor could result in an almost immediate shutdown of the business and its liquidation.

16. Accordingly, it is the Debtor's business judgment that the Debtor's operation must be sold immediately to avoid an erosion in the business's value and a shutdown resulting in the loss of approximately  jobs.

## BIDDING PROCEDURES AT SALE HEARING

17. To maximize the sale proceeds, the Debtor requests that the Court conduct an open auction at the Sale Hearing on the following terms and conditions:

(a)     All initial competing bids must equal or exceed $425,000.00;

(b)     All subsequent bids shall be in increments of $2,500.00;

(c)     All competing bids must be accompanied by a good faith deposit in the amount of $42,500 by certified or cashier's check payable to counsel for the Debtor which shall be forfeited if the buyer fails to close or to execute the Agreement, modified *only* as to the identity of the buyer and price, or such other terms that are more favorable to the Debtor than the terms set forth in the Agreement. If requested by the Debtor, the buyer must demonstrate satisfactory proof of its ability to consummate the sale before being permitted to either bid or purchase the assets;

(d)     All counterbids cannot be subject to any conditions including, but not limited to, any condition based upon the competing bidder's ability to obtain financing, except for those conditions set forth in the Agreement;

(e)     The assets shall be sold "AS IS," "WHERE IS," without any representation or warranty of any type whatsoever, except that the Debtor has and owns good and marketable title to the assets being offered for sale;

(f)     The Debtor reserves the right to: (i) impose, at or prior to the Sale Hearing, additional terms and conditions; and (ii) extend deadlines or adjourn the Sale Hearing in open court without further notice; and

(g)     The sale is contingent upon the bidder being the successful bidder for the assets owned by Garnet Hill Lodge, Inc.

18.     The Debtor seeks an order authorizing it to enter into the asset purchase Agreement pursuant to Bankruptcy Code §363(b) and (f), §365, and §105.

**SALE TO SUCCESFUL BIDDER**

19.     By this Motion, the Debtor requests an Order pursuant to Bankruptcy Code § 363 and § 365 authorizing the sale of the Assets and assignment of targeted agreements, free and clear of all liens and other interests, to Pine Meadows Property, LLC or the successful bidder ("Purchaser"), according to terms set forth in the asset sale Agreement, subject to higher and better offers made on the return date of the Motion.

20.     Under the Agreement, a copy of which is annexed as Exhibit A, Purchaser has agreed to acquire substantially all of the Debtor's assets for $400,000.00 and Garnet Hill Lodge, Inc.'s assets for $800,000.00 for a total purchase price of $1,200,000.00, including:

(a)     the real property more particularly described on Exhibit A to the Agreement (collectively, the "Real Property");

(b)     All trade accounts receivable, trade notes receivable and other rights to receive payment from customers of the business, including accrued accounts receivable representing amounts payable for products sold and/or services rendered, but not yet invoiced or billed as of the Closing Date (collectively, the "Receivables");

(c)     All inventories of raw materials, work-in-process, finished goods, parts, factory and maintenance supplies and other inventory items of the business (collectively, the "Inventory");

(d)     All machinery, equipment and vehicles owned by the Debtor and located at the Real Property (the "Fixed Assets");

(e)     All furniture and fixtures of the Debtor located on the Real Property;

(f)     To the extent permitted by law and any subject warranty agreement, all manufacturers' warranties and/or vendors' warranties in effect with respect to any of the Fixed Assets and/or the Inventory;

(g)     All patents, trademarks, trade names, copyrights and other intellectual property, and all pending applications and registrants therefore, and all goodwill related thereto, which are used in the business and in which the Debtor has any rights;

(h)     All customer lists, supplier lists, operating manuals, trade secrets, confidential information, technical information, and other such knowledge and information constituting the "know-how" of the business, as well as all operational books and records used in the business; and

(i)     To the extent assignable, all right, title and interest in all governmental licenses and permits utilized by the Debtor in the business.

21.     The Debtor makes no warranty, express or implied, with respect to the conformity, adequacy, condition or fitness for any particular purpose of any of the assets being sold, and all of the assets are being transferred to the Buyer "AS IS" and "WHERE IS."

22.     The Purchaser is responsible for the payment of all sales and use taxes, if any, which may arise out of or be assessable in respect of the transactions contemplated by the Agreement.

23.     Prior to closing, the Debtor shall permit the Purchaser and its counsel, accountants and other representatives to have reasonable access to all records and information relating to the

Debtor's business. After the closing, the Purchaser is required to give the Debtor reasonable access to the books and records turned over to the Purchaser so that the Debtor can continue to administer its chapter 11 case.

24. Subject to any requirements imposed by the Court, the Debtor will continue to carry on its business in substantially the same manner as it has during the chapter 11 case.

25. The Agreement is subject to Court approval and such higher and better offers that may be made at the hearing on the sale (the "Sale Hearing") in an amount at least $50,000.00 greater (the "Overbid Amount") than the amount payable under the Agreement.

26. The Agreement also provides that the sale is to be free and clear of all liens, claims, security interests and encumbrances of every kind and nature and other interests, with all such liens, claims, pledges, security interests, encumbrances and interests attaching to the proceeds of sale to the same extent and in the same order of priority of any existing liens, claims, security interests, encumbrances and interests of record, or as may be determined by the Court.

27. The Agreement was negotiated with Pine Meadows Properties, LLC at arm's length. Accordingly, the Debtor believes that Pine Meadows Properties, LLC is a good faith purchaser and is entitled to the protections of Bankruptcy Code § 363(m) should it be the successful bidder. The Debtor requests that the Court so find at the Sale Hearing.

28. If the Court approves a higher or better offer which is at least $50,000 greater than the consideration provided for under the proposal by Pine Meadows Properties, LLC under the Agreement and the Purchaser is not in default of any of its obligations, then, subject to the consummation of the proposed alternative transaction or any other subsequent sale by the Debtor which gives rise to such termination, the Debtor and North River Holdings, LLC shall pay to Pine Meadows Properties, LLC, simultaneously with the consummation of such alternative transaction,

their pro-rata share of the sum of $50,000 as consideration for Pine Meadow Properties, LLC time, expenses and forgone opportunities. Pine Meadow Properties, LLC right to the break-up fee shall constitute Pine Meadow Properties, LLC sole and exclusive remedy arising out of the termination of the Agreement in the event that the Debtor accepts a higher or better offer.

## AUTHORITY FOR MOTION

### *Bankruptcy Code § 363(b) and (f) Sale.*

29. Bankruptcy Code § 363(b)(1) authorizes the trustee (or a debtor in possession, who has the rights and powers of a trustee) to use, sell or lease property of the estate other than in the ordinary course of business.

30. The Debtor may sell free and clear of an interest (including a lien) of an entity other than the estate only if:

> (1) Applicable nonbankruptcy law would permit a sale of such property free of the interest;
>
> (2) The other entity consents;
>
> (3) The interest is a lien and the sale price is greater than the aggregate value of all liens on such property;
>
> (4) The interest is in bona fide dispute; or
>
> (5) The entity could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest.

31. Bankruptcy courts have substantial discretion when deciding whether to approve the sale of substantially all of the Debtor's assets outside of a plan of reorganization, especially when there is an articulated business justification. See *Official Committee of Unsecured Creditors of the LTV Aerospace and Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 975 F.2d 141, 144 (2d

Cir. 1992); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983)

32.     In determining whether to approve a proposed sale under Bankruptcy Code § 363, courts generally apply standards that, although stated variously ways, represent essentially a business judgment test. See, *Committee of Security Holders v. Lionel Corp,* 722 F.2d 1063, 1071 (2nd Cir. 1983).

33.     Once the Debtor has articulated a rational business justification, a presumption attaches that the decision was made on an informed basis, in good faith and in the honest belief that the action is in the best interest of the Debtor.  See, *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc.,* 147 B.R. 650, 656 (SDNY 1992).

34.     In addition, when there are exigent circumstances and the assets are subject to rapid deterioration, the courts have approved significant asset sales prior to the confirmation of a plan. *See In re Chateaugay Corp.*, 973 F.2d 141 (delay in sale risked a lower price in the future); *In re Pure Penn Petroleum Co.*, 188 F.2d 851 (2d Cir. 1951); *In re Solar Mfg. Corp.*, 176 F.2d 493 (3d Cir. 1949); *In re V. Loewer's Gambrinus Brewery Co.*, 141 F.2d 747 (2d Cir. 1944); *In re Weatherly Frozen Food Group, Inc.*, 149 B.R. 480 (Bankr. N.D. Ohio 1992) (sale approved because debtor did not have funds to repair or maintain manufacturing equipment to meet inspections).

35.     In this case, ample justification exists for the approval of the sale.  The Debtor's assets are subject to decline in value unless the Debtor can consummate a sale with a third party to preserve the business as a going concern. Unless a sale is approved, it is highly unlikely that the Debtor will be able to maintain the loyalty of its customers; the business will have to be shut down and liquidated. In addition, the Debtor currently has sufficient funding pursuant to its post-petition financing arrangement to operate, manufacture and complete orders. However, if a sale to a third

party is not consummated in a timely fashion, it is unclear whether the Debtor will be able to extend its financing arrangement. Thus, a prompt sale advances the interests of the estate and maximizes the value of the assets.

36.     The Debtor respectfully submits that the sale should be approved free and clear of liens and encumbrances and that the Debtor be authorized to pay TD Bank's secured claim together with other customary closing costs from the proceeds at closing.

*Bankruptcy Code  § 365 Assignment.*

37.     Bankruptcy Code §365(a) authorizes a debtor to assume and assign or to reject an unexpired lease or executor contract, subject to the Court's approval.

38.     The Debtor proposes to assign the unexpired leases and executor contracts more particularly described on the Asset Purchase Agreement (the "Targeted Agreements")

39.     The standard that is applied in determining whether an unexpired lease or executor contract should be assumed and assigned or rejected is the debtor's "business judgment" that the assumption or rejection is in the debtors' economic best interest. See *Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v Bildisco & Bildisco*, 465 U.S. 513, 523 (1984). The Debtors' assumption and assignment of the Targeted Agreements (subject to a successful bid) is an integral part of the Debtors' liquidation efforts as the equipment is located within the real property represented by the Targeted Leases and would bring substantially less value if sold through a liquidation sale.  Additionally, the Targeted Leases represent locations which have value to a Purchaser acquiring the Debtor's assets as a going concern.  Therefore, the assignment of the Targeted Leases to the Purchasers is within the Debtors' sound business judgment.

40.     Bankruptcy Code § 365(b)(1) codifies the requirements for assuming an unexpired lease of a debtor:

> If there has been a default in an executory contract of unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee:
>
> (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)    provides adequate assurance of future performance under such contract or lease.

41.     The Debtor agrees to comply with Bankruptcy Code § 365(b)(1)(A) and (B) by curing any defaults under any Targeted Agreements to be assumed and assigned.

42.     If requested at the Hearing, the Debtor will satisfy Bankruptcy Code §365(b)(1)(C) for any Targeted Agreements to be assumed and assigned, by demonstrating adequate assurance of future performance by the proposed assignee.

43.     The meaning of "adequate assurance" depends on the facts and circumstances of each case, but should "be given a practical pragmatic construction." *EBG Midtown S. Corp. v McLaren/Hart Envtl. Eng'g. Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (citation omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993). The assurance that rent will be paid is a chief determinant in assessing adequate assurance of future performance.

44.     Adequate assurance includes demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See*, *e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance was present when prospective assignee of lease from debtor had the financial resources, and an

expressed willingness, to devote sufficient funding to business in order to give it strong likelihood of succeeding).

45.     If a party affected by the assignment of the Targeted Agreement objects to an assumption and assignment, the Debtor will offer evidence at a Hearing to demonstrate the financial wherewithal of the relevant assignee. At a Hearing, the Court and interested parties will have the opportunity to evaluate and, if necessary, challenge the ability of the assignee to provide adequate assurance of future performance under the particular lease to be assumed and assigned. The Court will therefore have sufficient bases to find that adequate assurance of future performance exists.

*Break-up Fee*

46.     The Agreement requires the Debtor to pay Buyer a break-up fee in the amount of $ as liquidated damages for Buyer's time, expenses and lost opportunities in the event the Debtor accepts a *bona fide* offer for the assets in an amount that is at least $50,000.00 greater than a consideration provided for in the Agreement, provided, however, that Buyer is not in default and the Debtor consummates the alternative transaction. The Debtor believes that a break-up fee of about 4.2% of the aggregate purchase price is eminently fair and reasonable especially taking into account the significant time, effort and expense of Buyer in conducting its due diligence of the business and negotiating the definitive terms of the Agreement. *See In re Integrated Resources, Inc.*, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (break-up fee between $500,000 and $6,000,000 or approximately 3.2% of bidder's cash investment approved, reasoning that the break-up fee would enhance the bidding process and was reasonable in relation to the bidder's efforts and the magnitude and significance of the transaction); *In re 995 Fifth Avenue Assocs., L.P.*, 96 B.R. 24 (Bankr. S.D.N.Y. 1989). *See also* Paul B. Lackey, *An Empirical Survey and Proposed*

*Bankruptcy Code Section Concerning the Propriety of Bidding Incentives in a Bankruptcy Sale of Assets*, 93 Colum. L. Rev. 720, 732 (1993) (break-up fees ranging from .66% to approximately 2% of the purchase price have been determined by bankruptcy courts to be reasonable). Further, because the break-up fee is payable only if the Debtor consummates an alternative transaction, which must be at least $50,000.00 more than the amount called for under the Agreement, the estate is not prejudiced by payment of the break-up fee.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an Order pursuant to 11 U.S.C. § 363(b) and (5), §365, §105 authorizing the sale of the assets free and clear of all liens and other interests, such liens and other interests to attach to the proceeds of sale, pursuant to the terms and conditions set forth in this Motion and the annexed asset sale Agreement, together with such other and further relief as to this Court may seem just and proper.

Dated this 4th day of November, 2011

By: */s/ Christian H. Dribusch*
Christian H. Dribusch

Reviewed and approved:

*/s/ Mary Donnellan-Fahy*
**Mary Donnellan-Fahy**, member
**North River Holdings, LLC**

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is dated November 3, 2011 ("Effective Date"), by and among NORTH RIVER HOLDINGS, LLC, a New York limited liability company ("NRH"), GARNET HILL LODGE, INC., a New York corporation ("Garnet Hill") and PINE MEADOWS PROPERTIES, LLC, a New York limited liability company ("Purchaser"). Each of NRH and Garnet Hill are sometimes referred to as a "Seller" and collectively, as the "Sellers."

WHEREAS. Sellers intend to jointly file a voluntary bankruptcy petition under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of New York, Albany Division (the "Bankruptcy Court") pursuant to which Sellers intend to act as debtors-in-possession (the "Bankruptcy Case").

WHEREAS, the Purchaser desires to purchase the Transferred Assets (as defined below), and the Sellers desire to sell the Transferred Assets to the Purchaser, all on the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363, 503 and other applicable provisions of the Bankruptcy Code; and

WHEREAS, the Transferred Assets will be sold pursuant to an order of the Bankruptcy Court approving such sale under section 363 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND RULES OF CONSTRUCTION

1.1     Definitions.  Unless otherwise defined herein, capitalized terms used herein shall have the meanings set forth below:

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such specified Person.

"Bill of Sale" means the Bill of Sale substantially in the form of Exhibit A hereto to be executed by Sellers and Purchaser on the Closing Date.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banks located in New York are authorized or obligated to close.

"Claim" means a suit, claim, action, proceeding, inquiry, investigation, litigation, demand, charge, complaint, grievance, arbitration, indictment, information, or grand jury subpoena.

"Governmental Body" means a domestic or foreign national, federal, state, provincial, or local governmental regulatory or administrative authority, department, agency, commission, court, tribunal, arbitral body or self-regulated entity.

"<u>IRS</u>" means the United States Internal Revenue Service.

"<u>Law</u>" means any federal, state or local statute, law, rule, regulation, order or other requirement of any Governmental Body.

"<u>Liabilities</u>" means any direct or indirect, primary or secondary, liability, indebtedness, obligation, penalty, cost or expense (including costs of investigation, collection and defense), Claim, deficiency, guaranty or endorsement of or by any Person (other than endorsements of notes, bills, checks and drafts presented for collection or deposit in the ordinary course of business) of any type, whether accrued, absolute or contingent, liquidated or unliquidated, choate or inchoate, matured or unmatured, or otherwise. Without limiting the foregoing, the term "Liabilities" includes and refers to all liabilities and obligations for or with respect to Taxes, including liabilities for Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provision of any applicable Law), as a transferee or successor, by contract, or otherwise.

"<u>Person</u>" means any individual, corporation, partnership, limited liability company, limited liability partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"<u>Representative</u>" means, with respect to a particular Person, any director, officer, manager, partner, member, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants, and financial advisors.

"<u>Tax</u>" or "<u>Taxes</u>" means all taxes, charges, fees, imposts, levies or other assessments, including, without limitation, all net income, franchise, profits, gross receipts, capital, sales, use, ad valorem, value added, transfer, transfer gains, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, real or personal property, and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, together with any interest and any penalties, fines, additions to tax or additional amounts thereon, imposed by any taxing authority (federal, state, local or foreign) and shall include any transferee liability in respect of Taxes.

"<u>Third Party</u>" means any Person other than the Sellers, the Purchaser or any of their respective Affiliates.

1.2     <u>Rules of Construction</u>. The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement. Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)     Any reference in this Agreement to "dollars" or "$" shall mean U.S. dollars.

(b)     All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

<u>Exhbit A</u>

(c)     Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(d)     The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(e)     The words such as "herein," "hereinafter", "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(f)     Unless the context otherwise clearly indicates, in this Agreement "includes" and "including" are not limiting.

## ARTICLE II
## PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES

2.1     <u>Purchase and Sale of Assets</u>. Subject to the terms and conditions set forth in this Agreement and approval of the Bankruptcy Court, at the Closing, the Sellers shall sell, assign, transfer, convey and deliver (or cause to be sold, assigned, transferred, conveyed and delivered) to the Purchaser, and the Purchaser shall purchase, assume and accept from the Sellers, all right, title and interest in and to all of the "Transferred Assets" in accordance with, and with all of the protections afforded by, Section 363 of the Bankruptcy Code.  The "Transferred Assets" shall mean all of the business, assets, properties, contractual rights, goodwill, going concern value, rights and Claims of any Seller to the extent based on the Sellers' business and related to the business conducted by any Seller (the "Business"), wherever situated and of whatever kind and nature, real or personal, tangible or intangible, whether or not reflected on the books and records of any Seller (other than the Excluded Assets).

2.2     <u>Excluded Assets</u>.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to the Purchaser, and the Sellers shall retain all right, title and interest to, in and under the Excluded Assets.  The "Excluded Assets" shall mean each of the assets set forth on Schedule 2.2.

2.3     <u>Assumption of Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall assume, effective as of the Closing, only the following liabilities of the Sellers (collectively, the "Assumed Liabilities"): all Liabilities of the Sellers under the Purchased Contracts that arise based on events or circumstances first occurring on or after the Closing Date.  "Purchased Contracts" shall mean those contracts related to the Business listed in Schedule 2.3 attached hereto.

2.4     <u>Excluded Liabilities</u>.  Notwithstanding any provision herein to the contrary, the Purchaser shall not assume, succeed to, be liable for, be subject to, or be obligated for, nor shall the Transferred Assets be subject to, any Excluded Liabilities.  Sellers shall timely perform, satisfy and discharge in accordance with their respective terms all Excluded Liabilities.  "Excluded Liabilities" shall mean all Liabilities of Sellers arising out of, relating to or otherwise in respect of the Business before the Closing Date and all other Liabilities of Seller other than the Assumed Liabilities.

# ARTICLE III
# PURCHASE PRICE

3.1 <u>Purchase Price</u>. Subject to the terms and conditions hereof, in full consideration for the sale and purchase of the Transferred Assets, at the Closing, the Purchaser shall pay to the Sellers an amount equal to the following (the "<u>Purchase Price</u>"):

      (a)    the earnest money deposit in the amount of Ten Thousand and 00/100 Dollars ($10,000.00) (the "<u>Deposit</u>") to be paid by the Purchaser upon execution of this Agreement, which Deposit shall be held by Sellers' counsel in escrow until Closing; and

      (b)    an amount of One Million One Hundred Ninety Thousand and No/100 Dollars ($1,190,000.00) shall be paid to Sellers at the Closing.

3.2 <u>Allocation of the Purchase Price</u>. The parties hereto agree to file all Tax returns or reports including, without limitation, IRS Form 8594, regarding the allocation of the Purchase Price paid or exchanged for the Transferred Assets. The allocation of the Purchase Price paid or exchanged for the Purchased Assets will be as set forth on <u>Schedule 3.2</u> attached hereto.

# ARTICLE IV
# NO REPRESENTATIONS AND WARRANTIES OF SELLERS

4.1 Purchaser understands, acknowledges and agrees that Sellers are not making any representations whatsoever with respect to the Transferred Assets and Sellers are selling the Transferred Assets **"AS-IS," WHERE-IS," "WITH ALL FAULTS," and "WITH NO IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE."**

# ARTICLE V
# REPRESENTATIONS AND WARRANTIES OF PURCHASER

The Purchaser represents and warrants to Sellers on the date hereof and as of the Closing Date as follows:

5.1 <u>Due Organization and Authority</u>. The Purchaser is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of New York and has all necessary company power and authority to own, lease and operate its properties and to carry on its business as now being conducted. The Purchaser has all requisite power and authority to enter into this Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby. The execution and delivery by the Purchaser of this Agreement, the performance of its obligations hereunder and the consummation by the Purchaser of the transactions contemplated hereby have been duly authorized by all requisite action on the part of the Purchaser. This Agreement has been duly executed and delivered by the Purchaser, and, assuming the due authorization, execution and delivery hereof by the Sellers, this Agreement constitutes (or will constitute upon due execution and delivery) the legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, except to the extent enforceability may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting creditors' rights generally or by general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law).

5.2 <u>No Conflicts</u>. The execution and delivery by the Purchaser of this Agreement, the consummation of the transactions contemplated hereby, and the performance by the Purchaser of this Agreement in accordance with its terms will not:

(a) violate the articles of organization or operating agreement (or comparable instruments) of the Purchaser; or

(b) violate any Law to which the Purchaser or its assets are bound or subject; <u>provided</u>, <u>however</u>, that the case set forth in this clause (b) above is subject to exceptions that (i) would not reasonably be expected to have, either individually or in the aggregate, a material and adverse effect on the Purchaser or to prevent or materially delay the consummation by the Purchaser of the transactions contemplated by this Agreement or (ii) that arise as a result of any facts or circumstances relating to the Sellers.

5.3 <u>Litigation</u>. There are no Claims pending or, to the knowledge of the Purchaser, threatened against the Purchaser before any Governmental Body that would prevent or materially delay the consummation by the Purchaser of the transactions contemplated by this Agreement.

5.4 <u>Financing</u>. At the Closing, the Purchaser will have the funds necessary to consummate the transactions contemplated by this Agreement, including payment of the Purchase Price, and all related fees and expenses. Purchaser has no reason to believe that such available cash will not be available.

5.5 <u>Brokers</u>. The Purchaser has not paid or agreed to pay, or received any Claim with respect to, any brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated hereby.

5.6 <u>"As Is" Transaction</u>. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT NO SELLER NOR ANY OF THEIR RESPECTIVE AFFILIATES MAKES ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE BUSINESS OF THE SELLERS OR THE TRANSFERRED ASSETS (INCLUDING THE VALUE, CONDITION OR USE OF THE TRANSFERRED ASSETS) OR OTHERWISE WITH RESPFCT TO ANY OTHER INFORMATION PROVIDED TO THE PURCHASER, WHETHER ON BEHALF OF THE SELLERS OR THEIR AFFILIATES, INCLUDING AS TO (A) MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR USE OR PURPOSE, (B) THE OPERATION OF THE BUSINESS AFTER THE CLOSING IN ANY MANNER OR (C) THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE TRANSFERRED ASSETS BY THE PURCHASER AFTER CLOSING. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE TRANSFERRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE TRANSFERRED ASSETS AS PURCHASER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE TRANSFERRED ASSETS, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, PURCHASER WILL ACCEPT THE PROPERTY AT THE CLOSING "AS IS" "WHERE IS" AND "WITH ALL FAULTS". WITHOUT LIMITATION OF ANY OTHER PROVISION HEREIN, SELLERS SPECIFICALLY DISCLAIM ANY IMPLIED WARRANTY OF MERCHANTABILITY AND/OR SATISFACTORY QUALITY AND

ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE TRANSFERRED ASSETS.

## ARTICLE VI
## BANKRUPTCY COURT MATTERS

6.1     <u>Bankruptcy Court Matters</u>. On or before the fifth (5th) Business Day after the execution of this Agreement, the Sellers shall file (or shall have filed) a motion or motions with the Bankruptcy Court seeking entry of (a) an order of the Bankruptcy Court regarding the transactions contemplated by this Agreement, establishing notice and service requirements to creditors and parties in interest with respect thereto, approving the Break-Up Fee (as defined below), and approving the bidding procedures agreed by the parties (the "<u>Bidding Procedures</u>" and such order, with such changes thereto as the Purchaser shall approve, which approval shall not be unreasonably withheld, conditioned or delayed, being referred to herein as the "<u>Bidding Procedures Order</u>") and (b) an order of the Bankruptcy Court approving the sale of the Transferred Assets pursuant to this Agreement substantially in the form agreed by the parties (with such changes thereto as the Purchaser shall approve, which approval shall not be unreasonably withheld, conditioned or delayed) (the "<u>Sale Approval Order</u>").

6.2     <u>Bidding Procedures</u>.   The Bidding Procedures Order shall, among other matters;

      (a)     approve the Break-Up Fee,

      (b)     approve the Bidding Procedures;

      (c)     schedule a hearing to consider entry of the Sale Approval Order and provide that notice of such hearing be given to all of the Sellers; creditors, interest holders of record, the IRS, all state/local taxing authorities in jurisdictions where the Sellers have or may have any tax liability, and potential other purchasers identified by the Sellers and otherwise in accordance with Bankruptcy Rule 2002; and

      (d)     approve of the form of this Agreement.

6.3     <u>Sale Approval Order</u>. The Purchaser agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining the Sale Approval Order, including, furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by the Purchaser under this Agreement and demonstrating that the Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. The Purchaser shall not, without the prior written consent of the Sellers, file, join in or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Transferred Assets hereunder.

6.4     <u>Appeal</u>. In the event the entry of the Sale Approval Order shall be appealed, the Seller and the Purchaser shall use their respective reasonable efforts to defend such appeal.

6.5     <u>Competing Bids</u>.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Sellers of higher or better competing bids (each a "<u>Competing Bid</u>"). From the date hereof (and any prior time) and until the transaction contemplated by this Agreement is consummated, the Sellers are permitted to cause their respective Representatives and Affiliates to initiate contact with, solicit or encourage

submission of any inquiries, proposals or offers by, any Person (in addition to the Purchaser and its Affiliates, agents and Representatives) in connection with any sale or other disposition of the Transferred Assets. In addition, the Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Transferred Assets and perform any and all other acts related thereto that are required under the Bankruptcy Code or other applicable Law, including, supplying information relating to the Business and the assets of the Sellers to prospective purchasers. The parties agree that the Sellers shall be entitled to consider and enter into one or more transactions in connection with a Competing Bid consistent with their fiduciary obligations as a debtor in possession in the Bankruptcy Case.

# ARTICLE VII
## COVENANTS

7.1     <u>Expenses</u>.     Except as otherwise specifically provided herein or as approved by the Bankruptcy Court, the Purchaser and the Sellers shall bear their respective expenses incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including, all fees and expenses of their Representatives.

7.2     <u>Access to Information</u>. From the date hereof until the Closing, upon reasonable notice, each Seller shall afford the Representatives of the Purchaser reasonable access, during normal business hours, to the offices, properties, books and records of such Seller relating to the Transferred Assets, and (ii) furnish to the Representatives of the Purchaser such additional financial and operating data and other in Information regarding the Transferred Assets as the Purchaser may from time to time reasonably request.

7.3     <u>Further Action</u>. Each of the parties hereto shall execute such documents and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated hereby; provided that the Sellers shall not be obligated to incur or be liable for any expense, cost or obligation in connection therewith.

7.4     <u>Tax Matters</u>.

        (a)     <u>Sales, Use and Other Transfer Taxes</u>. The Purchaser shall be responsible for all of the excise, sales, value added, use, registration, stamp, franchise, transfer and similar Taxes incurred in connection with the transactions contemplated by this Agreement and which are not otherwise exempt pursuant to the applicable sections of the Bankruptcy Code. The parties hereto agree to cooperate in the filing of all necessary documentation and all Tax Returns with respect to all such Taxes.

        (b)     <u>Bulk Sales Law</u>. The Purchaser and Sellers hereby waive compliance with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Transferred Assets to the Purchaser.

7.5     <u>Notification of Certain Matters</u>. Until the Closing, each party hereto shall promptly notify the other party in writing of any fact, change, condition, circumstance or occurrence or nonoccurrence of any event of which it is aware that will or is reasonably expected to result in any of the conditions set forth in <u>Article VIII</u> or <u>IX</u> of this Agreement becoming incapable of being satisfied.

## ARTICLE VIII
## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment on or prior to the Closing Date of each of the following conditions, any one or more of which (to the extent permitted by applicable Law) may be waived by the Purchaser:

8.1     Covenants. The covenants and agreements contained in this Agreement to be complied with by the Sellers at or before the Closing shall have been complied with in all material respects.  The Purchaser shall have received a certificate of each Seller (the "Seller's Certificate")  to such effect signed by a duly authorized officer thereof.

8.2     No Order.  No Governmental Body shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other order (whether temporary, preliminary or permanent) which is in effect and has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting consummation of such transactions and which is not satisfied or resolved or preempted by the Sale Approval Order. All terminations or expirations of waiting periods imposed by any Governmental Body necessary for the transaction contemplated by this Agreement, if any, shall have occurred,

8.3     Bankruptcy Condition. The Sale Approval Order shall have been entered by the Bankruptcy Court. If the Sale Approval Order shall have been appealed from, the Purchaser agrees to consummate the transaction notwithstanding the pendency of such appeal, provided that no stay thereof shall be in effect.

8.4     Closing Documents. The Sellers shall have delivered to the Purchaser on the Closing Date the documents required to be delivered pursuant to Section 10.2.

## ARTICLE IX
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

The obligation of the Sellers to consummate the transactions contemplated by this Agreement is subject to the fulfillment on or prior to the Closing Date of each of the following conditions, any one or more of which (to the extent permitted by applicable Law) may be waived by the Sellers.

9.1     Representations and Warranties; Covenants. The representations and warranties of the Purchaser contained in this Agreement shall be true and correct both as of the date of this Agreement and as of the Closing, other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct as of such date, except where the failure to be so true and correct (without giving effect to any limitation or qualification as to "materiality" (including the terms "material" and "material adverse effect") set forth therein) would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the consummation by the Purchaser of the transactions contemplated by this Agreement. The covenants and agreements contained in this Agreement to be complied with by the Purchaser at or before the Closing shall have been complied with in all material respects. The Seller shall have received a certificate of the Purchaser (the "Purchaser's Certificate") to such effect signed by a duly authorized officer thereof.

9.2     No Order.  No Governmental Body shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other order (whether

temporary, preliminary or permanent) which is in effect and has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting consummation of such transactions and which is not satisfied or resolved or preempted by the Sale Approval Order. All terminations or expirations of waiting periods imposed by any Governmental Body necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

9.3     Bankruptcy Condition. The Sale Approval Order shall have been entered by the Bankruptcy Court.  If the Sale Approval Order shall have been appealed from, the Sellers agree to consummate the transaction notwithstanding the pendency of such appeal, provided that no stay thereof shall be in effect.

9.4     Payment. The Purchaser shall have paid the Purchase Price in accordance with Section 3.1(a) and (b) hereof.

9.5     Closing Documents. The Purchaser shall have delivered to the Sellers on the Closing Date the documents and payments required to be delivered by it pursuant to Section 10.3.

# ARTICLE X
# CLOSING

10.1     Closing. Subject to the terms and conditions of this Agreement and the Sale Approval Order, the sale and purchase of the Transferred Assets contemplated by this Agreement shall take place at a closing (the "Closing") to be held at the offices of Whiteman Osterman & Hanna, One Commerce Plaza, Albany, New York 12260 at 10:00 A.M., on the fifth (5th) Business Day following the satisfaction or waiver of all conditions to the obligations of the parties set forth in Articles VIII and IX (other than those conditions which by their nature can only be satisfied at the Closing), or at such other place or at such other time or on such other date as the Sellers and the Purchaser may mutually agree upon in writing or by "mail-away" procedure (the day on which the Closing takes place being the "Closing Date").

10.2     Deliveries by the Sellers. At the Closing, unless otherwise waived in writing by the Purchaser, the Sellers shall deliver or cause to be delivered to the Purchaser:

(a)     a duly executed counterpart of the Bill of Sale substantially in the form of Exhibit A hereto;

(b)     a deed, duly executed by NRH, with warranties of title typical for a commercial transaction in New York State, conveying to the Purchaser the Real Property owned by NRH;

(c)     a duly executed assignment and assumption agreement, pursuant to which the Sellers shall assign the right under and the Purchaser shall assume the obligations under the Purchased Contracts;

(d)     a duly executed Seller's Certificate for each Seller pursuant to Section 8.1;

(e)     all of the Books and Records relating to the Transferred Assets;  and

(f)     a receipt for the payment of the Purchase Price.

10.3    <u>Deliveries by Purchaser</u>. At the Closing, unless otherwise waived in writing by the Sellers, the Purchaser shall deliver or cause to be delivered to the Sellers;

(a)    the balance of the Purchase Price by wire transfer of immediately available funds to an account (or accounts) designated by the Sellers.

(b)    a duly executed counterpart of the Bill of Sale substantially in the form of <u>Exhibit A</u> hereto; and

(c)    a duly executed Purchaser's Certificate pursuant to <u>Section 9.1</u>.

**ARTICLE XI**
**<u>TERMINATION; TERMINATION PAYMENT</u>**

11.1    <u>Termination Prior to Closing</u>. Notwithstanding anything herein to the contrary, this Agreement may be terminated, and the transactions contemplated by this Agreement abandoned, at any time prior to the Closing, upon notice by the terminating party to the other party:

(a)    by the mutual written consent of the Sellers and the Purchaser;

(b)    by either the Sellers or the Purchaser if the Closing shall not have occurred prior to the ninetieth (90th) day following the date hereof (the "Termination Date"); <u>provided, however,</u> that the right to terminate this Agreement under this <u>Section 11.1(b)</u> shall not be available to any party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur prior to such date;

(c)    (i) by the Sellers, if the Purchaser breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform (A) would give rise to the failure of a condition set forth in <u>Article IX</u>, (B) has not been cured within ten (10) Business Days following delivery of written notice of such breach or failure to perform, and (C) has not been waived by the Seller; or (ii) by the Purchaser, if any Sellers breaches or fails to perform in any respect any of its covenants contained in this Agreement and such breach or failure to perform (x) would give rise to the failure of a condition set forth in <u>Article VIII.</u> (y) has not been cured within ten (10) Business Days following delivery of written notice of such breach or failure to perform, and (z) has not been waived by the Purchaser;

(d)    by either the Sellers or the Purchaser, if the Bankruptcy Court approves a sale, transfer or other disposition by the Sellers of all or any substantial part of the Transferred Assets in connection with a Competing Bid.

11.2    <u>Break-up Fee</u>.

(a)    In the event that this Agreement is terminated under <u>Section 11.1(d),</u> and <u>provided</u> that the Purchaser is not in material breach of any provision of this Agreement prior to such termination, the Sellers shall pay to the Purchaser, in cash, an amount equal to $50,000 (the "<u>Break-Up Fee</u>") not later than five (5) Business Days after the closing of a transaction in connection with a Competing Bid.

(b)    In the event that this Agreement is terminated, the Break-Up Fee shall be the Purchaser's sole and exclusive remedy against the Sellers, in full satisfaction of all of the Sellers' obligations hereunder.

<u>Exhbit A</u>

11.3    <u>Deposit</u>. If this Agreement is terminated by the Sellers pursuant to Section 11.1(c), the Sellers shall retain the full amount of the Deposit as partial liquidated damages for damages incurred by the Sellers by reason of any default by the Purchaser referred to in such Section <u>11.1(c)</u>. In such event, in addition to retaining the full amount of the Deposit, the Sellers shall he entitled to exercise all other rights existing in its favor against the Purchaser or any other Person. If this Agreement terminates for any other reason, the Sellers shall return the Deposit to the Purchaser.

11.4    <u>Survival After Termination</u>. If this Agreement is terminated pursuant to <u>Section 11.1</u> and the transactions contemplated hereby are not consummated, this Agreement shall become null and void and have no further force or effect, except that any such termination shall be without prejudice to the rights of any party on account of the non-satisfaction of the conditions set forth in <u>Article VIII</u> and <u>IX</u>, resulting from the intentional or willful breach or violation of the representations, warranties, covenants or agreements of another party under this Agreement. Notwithstanding anything in this Agreement to the contrary, the provisions of <u>Sections 11.3</u>, this <u>Section 11.4</u> and <u>Article XII</u> shall survive any termination of this Agreement.

**ARTICLE XII**
**<u>MISCELLANEOUS</u>**

12.1    <u>Amendment.</u> This Agreement may not be amended, modified or supplemented except by a written instrument signed by all of the parties to this Agreement.

12.2    <u>Notices</u>. Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (a) when received if given in person, (b) upon delivery, if delivered by a nationally known commercial courier service providing next day delivery service (such as Federal Express), or (c) upon delivery, or refusal of delivery, if deposited in the U.S. mail, certified or registered mail, return receipt requested, postage prepaid:

    If to the Sellers, addressed as follows:

        North River Holdings, LLC
        Garnet Hill Lodge, Inc.
        149 Old Farm Road
        North River, New York  12856
        Attn:  Mary Donnellan-Fahy

        with a copy to:

        Whiteman Osterman & Hanna LLP
        One Commerce Plaza
        Albany, New York  12260
        Attn:  John J. Henry, Esq. and Christian H. Dribusch, Esq.

    If to the Purchaser, addressed as follows:

        Pine Meadows Properties, LLC
        21 Stewart Road
        Johnsburg, New York  12843

<u>Exhbit A</u>

with a copy to:

Frank V. De Santis, Esq.
280 Main Street
P.O. Box 66
North Creek, New York  12853

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided.

12.3    Waivers. The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same. No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

12.4    Counterparts and Execution. This Agreement may be executed in two (2) or more counterparts (delivery of which may be by facsimile or via email as a portable document format (.pdf)), each of which will be deemed an original, and it will not be necessary in making proof of this Agreement or the terms of this Agreement to produce or account for more than one (1) of such counterparts.

12.5    Headings. The headings preceding the text of the Articles and Sections of this Agreement and the Exhibits and Schedules hereto are for convenience only and shall not be deemed part of this Agreement.

12.6    Applicable Law and Jurisdiction.

(a)    This Agreement and all Claims with respect hereto shall be governed by and construed in accordance with the federal bankruptcy law, to the extent applicable, and, where state law is implicated, the laws of the State of New York without regard to any conflict of laws rules thereof that might indicate the application of the laws of any other jurisdiction.

(b)    The Purchaser and the Sellers irrevocably and unconditionally consent to submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating hereto except in the Bankruptcy Court).

(c)    Any and all service of process and any other notice in any such Claim shall be effective against any party if given personally or by registered or certified mail, return receipt requested, or by any other means of mail that requires a signed receipt, postage prepaid, mailed to such party as herein provided. Nothing herein contained shall he deemed to affect the right of any party to serve process in any manner permitted by Law or to commence legal proceedings or otherwise proceed against any other party in any other jurisdiction.

12.7    Waiver of Jury Trial. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.8   <u>Binding Nature; Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other parties (which shall not be unreasonably withheld or delayed); except (a) that the Purchaser may assign any of its rights (but not its obligations) hereunder to any Affiliate or wholly owned subsidiary, (b) the Purchaser may grant a security interest in its rights and interests hereunder to its lenders, (c) the rights and interests hereunder may be assigned to any successor trustee appointed under chapter 11 or chapter 7 of the Bankruptcy Code, (d) this Agreement may be assigned to any entity appointed as successor to a Seller pursuant to a confirmed chapter 11 plan and (e) as otherwise provided in this Agreement.

12.9   <u>No Third Party Beneficiaries</u>. This Agreement is solely for the benefit of the parties hereto and no provision of this Agreement shall be deemed to confer upon third parties any rights, remedies or Claims.

12.10   <u>Entire Understanding</u>.  This Agreement, the Exhibits and the Schedules hereto (which shall remain in full force and effect) set forth the entire agreement and ˉunderstanding or the parties hereto in respect to the transactions contemplated hereby and this Agreement, the Exhibits and the Schedules hereto supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and are not intended to confer upon any other person any rights or remedies hereunder. There have been no representations or statements, oral or written, that have been relied on by any party hereto, except those expressly set forth in this Agreement, the Exhibits and the Schedules.

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Parties have caused this Asset Purchase Agreement to be duly executed, as of the date first above written.

**<u>SELLERS</u>**

NORTH RIVER HOLDINGS, LLC

By: _____
Name: _____
Title: _____


GARNET HILL LODGE, INC.

By: _____
Name: _____
Title: _____


**<u>PURCHASER</u>**

PINE MEADOWS PROPERTIES, LLC

By: _____
Name: _____
Title: _____

*[Signature Page to Asset Purchase Agreement among North River Holdings, LLC, Garnet Hill Lodge, Inc. and Pine Meadows Properties, LLC]*

<u>Exhbit A</u>

**Schedule 2.2**
**Excluded Assets**

None

Exhbit A

**Schedule 2.3**
**Purchased Contracts**


1.      License for Nonexclusive Use of Real Property between Garnet Hill Ski Trail, LLC and North River Holdings, LLC

2.      Equipment Contract with SYSCO Food Services.

Exhbit A

**Schedule 3.2**
**Allocation of the Purchase Price**

| | |
|---|---|
| Tangible Personal Property | $300,000 |
| Motor Vehicles | $20,000 |
| Merchandise for Resale | $30,000 |
| Real Property | |
|     Land | $40,000 |
|     Buildings | $360,000 |
| Goodwill | $450,000 |

Exhbit A

## EXHIBIT A

### BILL OF SALE

KNOW ALL PEOPLE BY THESE PRESENTS THAT **North River Holdings, LLC and Garnet Hill Lodge, Inc.** (collectively, "Sellers"), for good and valuable consideration to them paid by or on behalf of **Pine Meadow Properties, LLC** (the "Buyer"), do hereby grant, bargain, sell, transfer and deliver unto the Buyer, its successors and assigns, all of the Sellers' right, title to and interest in the assets described in Schedule A.

TO HAVE AND TO HOLD the same unto the Buyer, its successors and assigns, forever.

All representations and warranties made in the Asset Purchase Agreement dated November 3, 2011 by the Sellers with respect to the assets are incorporated herein by reference and shall survive the Closing under the Asset Purchase Agreement to the extent provided therein.

IN WITNESS WHEREOF, the Sellers have caused this instrument to be executed November 3, 2011.

NORTH RIVER HOLDINGS, LLC

By: _____

    Its:

GARNET HILL LODGE, INC.

By: _____

    Its:

Exhbit A